**In the Matter of the IMPEACHMENT OF Judith K. MORIARTY.**

**No. 77363.**

Supreme Court of Missouri,
En Banc.

Dec. 12, 1994.

Mark A. Richardson, Jefferson City, for House Manager.

Stuart K. Berkowitz, St. Louis, for Ms. Moriarty.

Jeremiah W. (Jay) Nixon, Atty. Gen., Don M. Downing, Deputy Atty. Gen., Erwin O. Switzer, III, Edward R. Ardini, Jr., Norman E. Siegel, Gretchen E. Rowan, Asst. Attys. Gen., Jefferson City, for amicus.

PER CURIAM.

Pursuant to Article VII, Sections 1 and 2 of the Missouri Constitution, the House of Representatives of the Missouri General Assembly filed Articles of Impeachment in this Court charging the Secretary of State, Judith K. Moriarty, with misconduct in office. Specifically, the Articles of Impeachment charge three acts of misconduct: First, that Judith K. Moriarty caused and directed or knowingly allowed the signature of Barbara Campbell to be placed on a certificate to a declaration of candidacy filed on behalf of Tim Moriarty and caused and directed or knowingly allowed the signature of Tim Moriarty to be placed on the declaration of candidacy, that as a result of these acts Moriarty caused and directed or knowingly allowed the creation of a false declaration of candidacy showing that Tim Moriarty appeared in the presence of Barbara Campbell at 1:19 p.m., on March 29, 1994, and signed, subscribed and swore the declaration of candidacy. The second and third are variations of the first. The second speaks only to the acts relating to Barbara Campbell's signature; the third charges acts relating only to the signature of Tim Moriarty.

Section 115.349.1, RSMo 1986, requires a person wishing to run in a primary election for state office to file "a written declaration of candidacy in the office of the [Secretary of State (Section 115.353.1)] by 5:00 p.m. on the last Tuesday in March immediately preceding the primary election." Section 115.349.3 establishes a form for a declaration of candidacy and requires that

[i]f the declaration [of candidacy] is to be *filed in person*, it shall be *subscribed* and *sworn to* by the candidate before an official authorized to accept his declaration of candidacy....

[Emphasis added.] A candidate must file his or her declaration of candidacy *in person* unless physically disabled or a member of the armed forces. Section 115.355, RSMo 1986. The time and date of filing a declaration of candidacy have legal significance; the order of filing is certified to each election authority, Section 115.387, RSMo 1986, to determine the order in which names are placed on a primary ballot. The law expressly forbids the printing of any candidate's name on a ballot "unless his written, signed and sworn declaration of candidacy has been filed in the office of the appropriate election official." Section 115.347, RSMo 1986. Section 115.387 requires the Secretary of State to certify to each election authority a "list containing the name and address of each person who has filed a declaration of candidacy."

## II.

■ The evidence in this case shows that the manner in which the Secretary of State's office handled the filing of declarations of candidacy complied with the laws of Missouri as much by accident as by design. The requirement of Section 115.349.3 that the candidate subscribe and swear his or her declaration of candidacy "before an official authorized to accept his declaration of candidacy" was regularly ignored. Several candidates who ultimately ran for office never fulfilled the statutory requirement in that their signatures were not attested by "an official authorized to accept his declaration of candidacy", not by their own failure but as a result of the Secretary of State's filing procedures.

The evidence shows that the filing transaction involving Tim Moriarty was not the product of an arm's-length relationship, but resulted from the desire of the Secretary of State's staff to afford the son of the Secretary of State privileges and special treatment not available to any other person seeking public office. This special treatment permitted Tim Moriarty to complete some or all of the paperwork required to declare his candidacy and have that paperwork placed "on hold" until he could assure himself that he would not lose his state job. No other candidate received such treatment from the Secretary of State's Office.

Barbara Campbell, an administrative aide to the Secretary, testified that she helped Tim Moriarty fill out his paperwork on March 21, 1994, and that the Secretary of State, Tim Moriarty's mother, asked Mrs. Campbell to hold the paperwork until Tim could determine whether he could be a candidate and keep his government job. Mrs. Campbell is not a particularly believable witness. Nevertheless, Nadine Barrows, the Secretary's own witness, and Julie Rodenburg, both of whom worked with Mrs. Campbell in the Secretary of State's Office, confirmed that Tim Moriarty's paperwork was put "on hold."

According to the evidence, Tim Moriarty's March 21, 1994 declaration of candidacy was not officially filed. The evidence does not show, however, that the Secretary ordered Tim Moriarty's paperwork put "on hold."

There is no dispute that Tim Moriarty filled out some or all of the papers required to become a candidate for state representative on March 21, 1994, and that those papers were placed in Nadine Barrow's desk drawer "on hold." It is possible to assume, therefore, that Tim Moriarty's after-the-fact "discovery" of a copy of his signed, unattested, undated and untimed declaration of candidacy is part of the paperwork he completed on March 21, 1994, and was a copy of the declaration of candidacy he signed that day.

It is difficult to believe, however, the truth of Tim Moriarty's testimony that he suddenly found a copy of his March 21, 1994 "declaration of candidacy". The document contains at least three glaring omissions. First, there is no date printed on the document. In lieu of a date it reads "RECORD NOT FOUNDO." This computer notation indicates that the person creating the document either did not provide the computer program a date or used a date that could not exist, e.g. the 32nd day of the thirteenth month. "RECORD NOT FOUNDO," is the computer default when one of these omissions or errors occurs.

Second, the document bears no time. The ": XM" notation indicates either that the operator did not provide the computer program a time when she instructed the computer to produce a declaration of candidacy or that the operator provided a time between noon and 1:00 p.m. or midnight and 1:00 a.m. ": XM" is the computer default when one of these events occurs. Since all of the credible testimony was that Tim Moriarty appeared in the office of the Secretary of State at or near 4:00 p.m. on March 21, 1994, the ": XM" notation indicates that the operator failed to supply a time when creating the document on March 21, 1994.

Third, no member of the Secretary of State's staff attested Tim Moriarty's signature.

Other than Tim Moriarty's March 21, 1994 declaration of candidacy, *no other* declaration of candidacy placed in evidence contained all three of these omissions.

Whether Tim Moriarty's testimony is true or false as to the March 21, 1994 declaration of candidacy, however, does not affect this Court's conclusions. For purposes of decision, we can assume his testimony is true. Ms. Barrow's testimony, again offered by the Secretary, was that she destroyed Tim Moriarty's March 21, 1994 "declaration of candidacy" at the same time or around the time she deleted his name from the computer. This testimony offers one possible explanation for evidence that the computer assigned another candidate's March 24, 1994 declaration of candidacy a March 21, 1994 data listing. Nevertheless, as far as either the paper or electronic records of the Secretary of State's Office were concerned, the events of March 21, 1994, did not occur.

There is also no dispute that Tim Moriarty was not in Jefferson City on March 29, 1994, the last day for filing declarations of candidacy for state representative. Tim Moriarty so testified as did Judith Moriarty. Nor is there any disagreement that the declaration of candidacy upon which Tim Moriarty founded his candidacy was not filed on March 29, 1994, at 1:19 p.m.

Julie Rodenburg testified that the Secretary asked her to obtain copies of Tim Mor-

iarty's declaration of candidacy some time in May, 1994, because she needed to see a copy of Tim Moriarty's signature. At that time, the Secretary personally discovered that the declaration of candidacy on file for Tim Moriarty did not contain the signature either of Tim Moriarty or an attesting official of the Secretary of State's office.

Thereafter, Barbara Campbell signed the declaration of candidacy; Tim Moriarty returned to Jefferson City to add his signature at some later date. All of this took place before June 3, 1994.

Aware of the discrepancies in Tim Moriarty's March 29, 1994 declaration of candidacy, the Secretary nevertheless certified or permitted her staff to certify over her signature that her son was officially a candidate for state representative on June 3, 1994. This action could not have been based on any official document filed in accordance with the law. This is because (1) Nadine Barrows had destroyed the original of the March 21, 1994 filing and deleted any record of it from the computer; (2) office policy did not permit holding declaration of candidacy filings for official filing at some future date; (3) Tim Moriarty did not appear in Jefferson City on March 29, 1994; (4) Section 115.355 requires that a candidate appear in person to file a declaration of candidacy; and (5) the March 29, 1994 declaration of candidacy failed to include either Tim Moriarty's signature or the signature of any member of the Secretary's staff. From these facts, it is apparent that Tim Moriarty never filed a declaration of candidacy at 1:19 p.m., March 29, 1994.

Even if one assumes that an overzealous and personally ambitious staff person committed most of the errors and violations of law and office policy in the filing of Tim Moriarty's March 21, 1994 paperwork, it remains beyond dispute that the Secretary of State discovered the absence of the signatures required by Section 115.347 on her son's declaration of candidacy and, aware of the failure of her son's declaration of candidacy to meet the requirements of the law, she nevertheless certified him or permitted her staff to certify him over her signature as a properly filed candidate for state representative on June 3, 1994.

Moreover, from her son's testimony, it is clear that the time and date statements on the March 29, 1994 declaration of candidacy are false. They are not the product of a clerical error; they are outright fiction. By relying on or permitting her staff to rely on her sons' unsigned and unattested declaration of candidacy as the basis for the official certification of her son as a candidate, the Secretary ratified her staff's actions, even if she did not personally commit or direct them.

It does not matter that the Secretary believed Tim Moriarty had filed for office on March 21, 1994. Under Section 115.349, he was not a candidate for office based on the March 29, 1994 paper filed in her office. Moreover, Section 115.347 forbad the printing of any candidate's name on a ballot "unless his written, signed and sworn declaration of candidacy has been filed in the office of the appropriate election official." Subsequent certification of Tim Moriarty's candidacy based on the addition of signatures to the March 29, 1994 declaration of candidacy after the close of filing violated Sections 115.347, 115.349.2, and 115.387.

The Secretary of State's theory of the case is apparently twofold. First, she claims that Tim Moriarty completed all of the paperwork necessary to become a candidate for state representative on March 21, 1994, and that the acts of Barbara Campbell and Nadine Barrows violated Section 115.359, RSMo 1986, which permits withdrawal from candidacy only by affidavit. Second, she claims that the March 29, 1994 declaration of candidacy (a) either corrected the staff error of destroying electronic and paper records of the March 21, 1994 filing or (b) reflected a clerical oversight that actually occurred on March 29, 1994.

None of this assists the Secretary in answering the specific charges brought in the Articles of Impeachment that she knowingly allowed her son and her staff to create a false declaration of candidacy showing that her son filed for office at 1:19 p.m. on March 29, 1994. That Tim Moriarty actually filed on March 21, 1994, is neither credible nor relevant. It is not credible because Tim Moriarty's employer, the Department of Labor and Industrial Relations, through its Di-

rector, did not officially inform Tim Moriarty that he had permission to run for office until March 28, 1994. This evidence supports the House Managers' position that Tim Moriarty's paperwork was put on hold until he could determine whether he could keep his state job and run for office. Had Tim Moriarty actually filed for office without the permission of his employer, he risked forfeiting his job. Since he did not know whether his employer would allow his candidacy, he could not risk an official filing of a declaration of candidacy until after the Director officially informed him that he could maintain his job while a candidate for state representative. This did not occur until March 28, 1994.

It is not relevant because, even if the March 21, 1994 filing occurred and all of the testimony and evidence elicited to prove that filing were true, the date and time on the March 29, 1994, 1:19 p.m., filing was patently false. Tim Moriarty did not file a declaration of candidacy on March 29, 1994, by his own admission. Nevertheless, the Secretary ratified the use of the March 29, 1994 declaration of candidacy as a valid declaration of candidacy when she certified or permitted her staff to certify the filings for all offices on June 3, 1994, knowing that her son had not signed the March 29, 1994 declaration of candidacy in violation of Section 115.349.

### III.

■ The Articles of Impeachment charge that the Secretary "did purposely cause and direct or did 'knowingly allow'" the signature of Tim Moriarty or Barbara Campbell or both of them to be placed on an unsigned declaration of candidacy so that the declaration falsely declared that Tim Moriarty appeared in the presence of Barbara Campbell to declare for office on March 29, 1994, at 1:19 p.m. A person "knowingly allows" an act when she fails to prevent or repudiate conduct by a person under her supervisory control, provided she is aware of the nature of the conduct. *See Sooter v. Magic Lantern, Inc.*, 771 S.W.2d 359, 363 (Mo.App.1989) ("[a]n unauthorized act of an agent may be affirmed by a principal who fails to repudiate the act after learning of it.") and *Compton v. Vaughan*, 222 S.W.2d 81, 83 (Mo.1949) (Fail-

ure of the principal to "protest, or dissent, or disaffirm or repudiate ... will be liberally construed in favor of the ratification by the principal.")

By certifying or allowing her staff to certify Tim Moriarty as a candidate for state representative over her signature on June 3, 1994, aware that the March 29, 1994 declaration of candidacy originally contained neither the candidate's signature nor an attestation of that signature, the Secretary failed to prevent and failed to repudiate conduct that created a false declaration of candidacy. More, the Secretary knew or should have known that her silence would result in a false certification that Tim Moriarty properly filed as a candidate for state representative on March 29, 1994, at 1:19 p.m. Thus, the Secretary knowingly allowed the creation of a false declaration of candidacy as charged by the Articles of Impeachment.

To convict, this Court must find that the Secretary committed the act(s) charged by clear and convincing evidence. We find that the House Managers have proved, by clear and convincing evidence, each of the elements averred in the three Articles of Impeachment passed by the House of Representatives. Indeed, were the standard beyond a reasonable doubt as the Secretary urges, the House Managers nevertheless met their burden.

### IV.

■ That this Court has a constitutional role in impeachments of state officials is unusual among the states. Only the Nebraska Supreme Court bears a similar responsibility. Whether our present role is the product of the Senate's failure to convict a state treasurer who was also a former senator impeached by the House of Representatives is an interesting historical question.[1] Whatever the constitutional reason for our responsibility, however, this Court must assume that our role is as a court, not as a substitute political body.

This distinction between the role of this Court and the role of a Senate is not one of mere theoretical interest. Historically, impeachment is as much a political act as a legal one. Indeed, the United States House of Representatives impeached President Andrew Johnson for, among other things, speaking ill of Congress. An impeachment is thus a judgment by the House of Representatives—one of the popularly-elected, representative bodies of the people's General Assembly—that an officer of the state has committed acts such that, were an election held, the people would not permit the impeached officeholder to remain in office. When a Senate determines whether to convict under articles of impeachment, the vote affirms or rejects the judgment of the House. Under this system, the possibility exists that the House may impeach and the Senate may convict an official for purely political reasons, though they clothe their charges with constitutional language like "misconduct."

Missouri's constitutional provision is a clear acknowledgment that the trial of impeachment charges is essentially judicial in character and is not a political function. This Court can convict only where there is actual misconduct as the law defines it. "Misconduct" means doing an unlawful act, doing a lawful act in an unlawful manner, or failing to perform an act required by law. It does not include errors in judgment, acts done in good faith, or good faith exercise of discretion. *Mid–South Indoor Horse Racing, Inc. v. Tennessee State Racing Commission,* 798 S.W.2d 531, 538 (Tenn.App.1990).

The vast majority of the duties assumed by the Secretary of State are ministerial. In elections particularly, the legislature has established specific criteria outlining the manner in which candidates declare for office and the time within which such declarations can be received by the Secretary of State. The statutes prohibit the printing of the name of a candidate on a ballot unless "his *written, signed and sworn* declaration of candidacy has been filed." [Emphasis added.] § 115.347.1.

---

1. In *State ex inf. Shartel v. Brunk,* 326 Mo. 1181, 34 S.W.2d 94 (banc 1930), this Court decided that *quo warranto* proceedings did not lie against the state treasurer to oust him from office. The question apparently arose after the House had impeached the state treasurer and the Senate refused to convict.

Compliance with statutorily established requirements is at the heart of the duties of the office. When a Secretary of State becomes aware that a declaration of candidacy fails to meet the requirements of the law, it is not negligence to proceed or permit her staff to proceed to certify the candidate as properly filed; it is deliberate misconduct. It ignores the clear directives of the law for which the Secretary bears ultimate responsibility. More, by allowing a candidate to sign a declaration of candidacy after the close of filing, it creates the false appearance that the candidate—here the Secretary's own son—actually signed the declaration, covering up a potential challenge to the legality of the filing by his opponent. This is exactly the sort of misconduct for which the constitution contemplates impeachment and removal from office.

We conclude that the charges of misconduct in the Articles of Impeachment are true; that those acts are misconduct and that the misconduct is not *de minimis*.

### JUDGMENT

On the evidence and law, this Court concludes that the Articles of Impeachment are true and that Judith K. Moriarty is convicted. Accordingly, this Court enters its judgment of impeachment.

/s/ Ann K. Covington
ANN K. COVINGTON
Chief Justice

/s/ John C. Holstein
JOHN C. HOLSTEIN
Judge

/s/ Duane Benton
DUANE BENTON
Judge

/s/ Elwood L. Thomas
ELWOOD L. THOMAS
Judge

/s/ William Ray Price, Jr.
WILLIAM RAY PRICE, JR.
Judge

/s/ Stephen N. Limbaugh
STEPHEN N. LIMBAUGH
Judge

/s/ Edward D. Robertson, Jr.
EDWARD D. ROBERTSON, JR.
Judge